UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SHIRLEY SCHEIER, an individual,

          Plaintiff,

    v.

CITY OF SNOHOMISH, a municipal
corporation, and DARLENE GIBSON, CHUCK
MACKLIN, and ALEXANDER ROSS, all
individuals,

          Defendants.

CASE NO. C07-1925-JCC

ORDER

This matter comes before the Court on Defendant Officers' Motion for Summary Judgment (Dkt. No. 22), Plaintiff's Response (Dkt. No. 24), Defendants' Reply (Dkt. No. 27), and Defendant City of Snohomish's Motion for Summary Judgment on Municipal Liability (Dkt. No. 32), Plaintiff's Response thereto (Dkt. No. 36), and Defendant's Reply (Dkt. No. 40). The Court has carefully considered these documents, their supporting declarations and exhibits, and the balance of relevant materials in the case file, and has determined that oral argument is not necessary. For the reasons explained below, the Court hereby DENIES Defendant Officers' Motion and DENIES in part and GRANTS in part Defendant City of Snohomish's Motion and rules as follows.

## I.    FACTUAL BACKGROUND

This lawsuit arises from the investigative stop and detention of Plaintiff Shirley Scheier by Snohomish police officers. Plaintiff has sued the City of Snohomish (the "City") and Deputy Chief Chuck

ORDER – 1

Macklin, Officer Darlene Gibson, and Officer Alex Ross (the "Officers") alleging they violated her

constitutional rights and state law when they stopped and detained her following an incident at the

Bonneville Power Administration ("BPA") substation in Snohomish.

Scheier is an Associate Professor of Art at the University of Washington. Her artwork focuses on

depicting waterways and industrial systems and their relationship to the environment. (Sheier Dep.

80:1–24 (Dkt. No. 26-2 at 12).) On the morning of October 15, 2005, Scheier drove to Snohomish,

Washington to take photographs of power lines and towers around the BPA facility for use in her

artwork. (*Id.* at 48:24–49:3.) Upon arrival, she drove around outside the facility looking to find

unobstructed views of the power lines. (*Id.*) Sheier came across an entryway and drove up it until she

came to an intercom indicating that the entrance was for employees only. (*Id.* at 49:12–17.) She then

turned around, drove back out the entrance, and parked across the street in a restaurant's parking lot. (*Id.*

at 49:20–50:5.) After parking her car, Sheier walked up the driveway toward the facility and through a

grassy area where she stopped near a fence to take a couple of pictures. (*Id.* at 52:9–16.) She determined

that the location did not offer a good vantage for pictures and returned to her car to find another location.

(*Id.* at 52:16–17.) Scheier then drove to several other locations in the area to take photographs, stopped

at a coffee shop to buy tea, and drove back to Highway 9. (*Id.* at 56:1–4.)

Scheier's activity around the substation had attracted the attention of BPA personnel.[1] After

Scheier drove away from the facility, a BPA employee called 911 to report "suspicious circumstances"

involving a female driving a brown four-door sedan and taking pictures of the substation "outside [the]

secured gate." (Dispatch (Dkt. No. 20 at 17).) Officer Gibson responded to the call and went to the

---

[1]The BPA substation is considered a critical piece of infrastructure. Following concerns arising from the terrorist attacks of September 11, 2001, a Joint Terrorism Task Force identified the BPA substation as a potential terrorist target. (Havener Decl. ¶¶ 3–4 (Dkt. No. 21 at 2).) In response, the Department of Homeland Security funded a grant so that the City of Snohomish could develop a special reaction force to deal with potential terrorist threats. (*Id.* at ¶ 5.) Snohomish police officers have been informed of the sensitive nature of the facility, and most officers have been given a tour of the substation by BPA personnel. (*Id.* at ¶ 7.)

ORDER – 2

1   substation to investigate. (Gibson Report 1 (Dkt. No. 20 at 19).) Meanwhile, Deputy Chief ("D.C.")

2   Macklin dispatched to the outlying area to look for a matching vehicle. (*Id.*) A BPA employee told

3   Officer Gibson that she observed a woman in a vehicle approaching the security gate and conducting a u-

4   turn before parking at a restaurant across the street. (*Id.*) Another employee had investigated the incident

5   and told Officer Gibson that he saw a woman with dark hair and a pink shirt taking pictures of the facility

6   near the entrance and the woman reportedly "ran to her vehicle" when approached. (*Id.*) Officer Gibson

7   radioed D.C. Macklin and advised him of the description of the suspect and vehicle. (*Id.*)

8       D.C. Macklin located Scheier driving on Highway 9 and pulled her over because she matched the

9   suspect and vehicle description. (Macklin Report 1 (Dkt. No. 20 at 34).) Scheier had her driver's license

10  and registration out and provided them to Macklin when he first contacted her. (*Id.*) He told Scheier that

11  he was stopping her "because of her suspicious behavior at the BPA facility." (*Id.*) Scheier explained that

12  she was a Professor of Fine Arts at the University of Washington and was taking pictures of the facility

13  because she saw the towers and lines as poetic. (*Id.*) She also provided Macklin with her employee ID

14  card from the University of Washington. (*Id.*) She told the officer that she had taken seventeen pictures

15  of the facility and showed him her 35mm camera that indicated seventeen pictures had in fact been taken.

16  (*Id.*) Macklin asked Scheier if she thought her taking photographs was "highly suspicious," and she

17  responded that she did not think it was. (Scheier Dep. 57:24–58:3 (Dkt. No. 26-2 at 7–8).) He asked her

18  why she was in the area taking photographs, and she explained that she liked the landscape. (*Id.* at

19  58:24–59:2.)

20      D.C. Macklin asked Scheier how she came to be at the BPA facility to take pictures. (Macklin

21  Report 1 (Dkt. No. 20 at 34).) She explained that she lives in North Seattle and noticed the facility when

22  she passed by it while taking her boyfriend to his work in Everett. (*Id.*) Macklin noticed a street map on

23  the passenger seat and asked Sheier to look at it. (*Id.*) She handed it to him, and he observed that several

24  areas on the map were circled. (*Id.*) These areas included SeaTac Airport, the Westin Hotel, and an area

25  north of Seattle Center. (*Id.*) After Officer Gibson and Officer Alex Ross arrived, the Officers decided to

26  ORDER – 3

1   remove Scheier from the car and handcuff her while D.C. Macklin contacted the FBI. (*See id.*)

2        Officer Gibson asked Scheier to step out of the car, and then removed her from the car without

3   allowing her to turn it off or lock it. (Sheier Dep. 61:19–62:3 (Dkt. No. 26-2 at 8–9).) Officer Gibson

4   handcuffed Sheier and frisked her before placing her in a patrol car. (*Id.* at 63:8–9.) While in the back of

5   the patrol car, Scheier gave the officers permission to search her car. (*Id.* at 68:17–18.) The officers

6   located eight rolls of exposed 35mm film in Scheier's car. (Macklin Memo 2 (Dkt. No. 20 at 38).) D.C.

7   Macklin consulted with the FBI and was informed that Scheier could be released. (City's Mot. 7 (Dkt.

8   No. 32.).) The Officers then released Scheier, who was "visibly shaking," and escorted her back to her

9   vehicle. (Macklin Memo 3 (Dkt. No. 20 at 29).) The total time of Sheier's stop and detention was about

10  forty-four minutes. (*Id.*) She was handcuffed and detained in the back of Officer Gibson's patrol car for

11  approximately twenty-six minutes. (*Id.*)

12       Following the incident, Scheier wrote a complaint to Senator Maria Cantwell, who contacted the

13  City about the incident. (Cantwell Letter (Dkt. No. 37-4 at 1).) In response, the City Manager, Larry

14  Bauman, reviewed the incident and the Officers' conduct, and responded to Senator Cantwell in a three-

15  page letter. (City's Letter (Dkt. No. 26-5).) The letter related the City's perspective of the facts and

16  justifications for the Officers' actions. (*See id.*) The City's letter then concluded that "the suspicious facts

17  as we have articulated them clearly justified the brief detention and actions taken by our officers when

18  considered in context." (*Id.* at 3.)

19       Plaintiff filed suit against Defendant City of Snohomish and Defendant Officers alleging violation

20  of her First and Fourth Amendment rights, as well as state law claims of false arrest, negligence, and

21  invasion of privacy (Compl. (Dkt. No. 1). Defendant Officers now move for summary judgment dismissal

22  of Plaintiff's Fourth Amendment claim based on qualified immunity (Officers' Mot. 20–21 (Dkt. No.

23  22).) Defendant City of Snohomish also moves for summary judgment dismissal of Plaintiff's

24  constitutional claims for municipal liability and Plaintiff's state law false arrest, negligence, and invasion

25  of privacy claims (City's Mot. 18–19 (Dkt. No. 32).)

26  ORDER – 4

1

**II.    ANALYSIS**

2

    **A.    Motion to Supplement Opposition**

3       As a preliminary matter, Plaintiff requests leave to supplement her opposition to Defendant

4   Officers' Motion for Summary Judgment. Specifically, she asks to submit testimony to rebut Commander

5   Fred Havener's Second Declaration that sought to authenticate photographs included in Defendants'

6   motion. Plaintiff explains that, since the date Commander Havener filed his Declaration, she had the

7   opportunity to take his deposition and elicit testimony regarding his knowledge of the photographs.

8   Plaintiff asserts that this testimony highlights the lack of Commander Havener's competency to testify as

9   to the accuracy of the photographs.

10      The Federal Rules of Civil Procedure provide that, in ruling on a summary judgment motion,

11  "[t]he court may permit an affidavit to be supplemented or opposed by depositions, answers to

12  interrogatories, or additional affidavits." FED. R. CIV. P. 56(e)(1). Defendants do not directly oppose

13  Plaintiff's request to supplement, and instead request leave to supplement their motion with Commander

14  Havener's testimony and Officer Ross' Declaration. Consequently, the Court finds it appropriate to

15  permit Plaintiff and Defendants to supplement the record with their evidence on the authenticity and

16  accuracy of the photographs. Plaintiff's Motion for Leave to Supplement Opposition (Dkt. No. 38) is

17  therefore GRANTED and the Court considers both parties' supplemental submissions on this issue.

18

    **B.    Motion to Strike**

19      Plaintiff requests that the Court strike or disregard Defendants' contentions regarding Scheier's

20  alleged trespass and disregard of BPA signage, and the accompanying photographs. (1st Resp. 22–23

21  (Dkt. No. 24).) Defendants argue that Scheier failed to comply with no trespassing and no unauthorized

22  vehicles signs when she drove up to the intercom outside the gate before turning around. (Officers' Mot.

23  13–14 (Dkt. No. 22).) They contend this constituted "suspicious behavior," (*Id.* at 5,) which contributed

24  to the Officers' justifications for her stop and detention. (*Id.* at 14.) In support, Defendants offer

25  photographs one through six, depicting various signs that Scheier allegedly ignored and drove past. (*Id.*

26  ORDER – 5

1    at 5–7.) Plaintiff vigorously disputes the authenticity and accuracy of these photographs.[2]

2           After carefully reviewing the photographs and their support, the Court finds that they lack

3    relevant evidentiary value on the reasonableness of the Officers' actions. The pictures, and the facts they

4    purportedly establish, are not probative of whether the Officers' investigatory stop and detention was

5    justified based on the available evidence *at the time of the stop*. The police reports written on the date of

6    the incident make no mention whatsoever of a possible trespass. (*See* Macklin Report (Dkt. No. 20 at

7    34–35); Gibson Report (Dkt. No. 20 at 19–20).) Nor do the reports suggest that trespassing formed a

8    basis for the stop. Instead, D.C. Macklin's report states that they were "dispatched to a suspicious

9    circumstances at the [BPA]" because "[e]mployees had seen an adult white female photographing the

10   facility" and then "driving away from the Substation." (Macklin Report 1 (Dkt. No. 20 at 34).)[3]

11   Moreover, the 911 call itself only reported "suspicious activity" involving a female taking pictures of the

12   substation "outside [the] secured gate." (Dispatch (Dkt. No. 20 at 17).) This evidence reveals that D.C.

13   Macklin's suspicions, at the time of the stop, were founded on Scheier's picture-taking and quick

14   departure from the facility. Photographs one through six merely provide *post-hoc* justifications for

15   detaining Scheier and are not probative of whether the Officer's actions were reasonable at the inception

16   of the stop. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968) (The question is "whether the officer's action was

17   justified at *its inception*, and whether it was reasonably related in scope to the circumstances which

18   justified the interference in the *first place*.") (emphasis added).

---

20      [2]Plaintiff does not object to photographs seven through eleven, which were taken by a BPA
     security camera and depict Plaintiff's vehicle turning around at the intercom outside the security gate. (1st
21   Resp. 23 n.3 (Dkt. No. 24).) A BPA employee provided these photographs to Officer Gibson when she
     arrived to investigate. (*See* Gibson Report 1 (Dkt. No. 20).) After reviewing these pictures, Officer
22   Gibson relayed the description of the suspect's vehicle to D.C. Macklin. (*Id.*) Thus, unlike photographs
     one through six, the information in these photographs contributed to the Officers' basis for stopping
23   Plaintiff.

24      [3] D.C. Macklin's memo to Chief Wilborg, also written on the date of the incident, describes the
     "suspicious circumstances" arising from Plaintiff's picture-taking and quick departure but does not
25   mention anything about ignoring signage or trespassing. (Macklin Memo 1 (Dkt. No. 20 at 37).)

26   ORDER – 6

D.C. Macklin's testimony further confirms that an alleged trespass did not form the basis for Plaintiff's stop. He testified:

> Q: So do you know whether the BPA called in to report a trespass?
> A: They called in a suspicious circumstances
> Q: But did they actually say, you know, Somebody's trespassing on my property. I need the police to come remove them?
> A: I don't know specifically what they did say. I didn't interview them directly, and I didn't listen to the 911 tape.
>       . . . .
> Q: I understand that you have no way of knowing, but nobody's told you at this point, Hey, somebody's committed trespass?
> A: No. I don't have probable cause for trespass, criminal trespass arrest, no.

(Macklin Dep. 76:25–77:14 (Dkt. No. 20 at 5).) Macklin's knowledge of the BPA incident *prior to the stop* was limited to the information provided by dispatch and relayed by Officer Gibson, neither of which indicated concern with a trespass. (*Id.* at 15:1–16:8.) The evidence therefore demonstrates that D.C. Macklin stopped Scheier because she matched the description of the suspect who photographed and quickly left the facility, not because he thought she trespassed. (*See id.* at 5:7–15.)

Moreover, even if the evidence showed that trespass formed a basis for Scheier's stop,[4] the Court is not convinced that the photographs demonstrate that Scheier necessarily drove past the signs depicted in photographs one through six. The aerial map of the facility indicates that Scheier could have driven through either of two entrances that merge leading up to the intercom box where she turned around. (*See* Aerial Photos (Dkt. No. 26-9 at 1–3).) Officer Ross' testimony further confirms that Scheier could have driven through either of these two entrances. (Ross Dep. 79:17–21 (Dkt. No. 42 at 13) ("Q: Is there like a just [sic] a narrow road that goes back to where that intercom box is? A: There's actually two entrances off of two different roads: off of Avenue D and Bonneville.").) While Officer Ross also stated that there

---

[4]In parts of their depositions, the Officers suggest that they were also investigating a possible trespass. (Macklin Dep. 76:19–24 (Dkt. No. 20 at 5); Gibson Dep. 12:20–24 (Dkt. No. 20 at 42); Ross Dep. 80:8–15 (Dkt. No. 42 at 13).) However, these statements are not corroborated by the police reports and conflict with D.C. Macklin's direct explanation as to why he stopped Plaintiff. (*See* Macklin Dep. Vol. II 15:1–16:8 (Dkt. No. 26-3 at 22); Macklin Dep. 74:21–22 (Dkt. No. 20 at 5) ("The details of the original [police] report establish the legal requirements for a Terry Stop: reasonable suspicion.").)

ORDER – 7

are signs at both of those entrances, Defendants have not sufficiently established that the particular signs depicted in the photographs were located at the specific entrance that Scheier accessed. Accordingly, given all the above deficiencies, the Court does not consider the photographs as evidence of trespass under the "totality of the circumstances" that could reasonably justify Plaintiff's stop. Plaintiff's motion to strike is therefore GRANTED insofar as the Court disregards photographs one through six in ruling on the summary judgment issues below.[5]

### C.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

---

[5]The Court makes this determination regardless of the authenticity or accuracy of the photographs.

ORDER – 8

1    **D.    The Officers' Summary Judgment Motion Based on Qualified Immunity**

2    Plaintiff's constitutional claims are brought pursuant to 42 U.S.C. § 1983, which provides a

3    private right of action against police officers who, acting under color of state law, violate federal

4    constitutional rights. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001). Defendant

5    Officers contend that they are entitled to qualified immunity on Plaintiff's Fourth Amendment claim

6    against the individual officers. (Officers' Mot. 21 (Dkt. No. 22).) The qualified immunity analysis

7    involves two steps. *Jackson*, 268 F.3d at 651. Following the methodology established by the U.S.

8    Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), courts first ask whether, based upon the facts

9    taken in the light most favorable to the plaintiff, the officer's conduct can be said to have violated a

10   constitutional right. *Jackson*, 268 F.3d at 651. If a constitutional violation occurred, "the second inquiry

11   is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct

12   did not violate a clearly established constitutional right." *Id.* (citation omitted).

13   Defendants first argue that qualified immunity is warranted because Plaintiff's Fourth Amendment

14   rights were not violated. (Officers' Mot. 12–18 (Dkt. No. 22).) In the alternative, the Officers assert that,

15   assuming a Fourth Amendment violation, qualified immunity still applies because they were not on notice

16   from clearly established law that their actions violated the Fourth Amendment. (*Id.* at 18–20.) Plaintiff

17   argues that the Officers are not entitled to qualified immunity because their actions violated established

18   Fourth Amendment principles. (1st Resp. 11–20 (Dkt. No. 24).)[6]

19

20   _____

21   [6]Plaintiff also asserts a claim under section 1983 for violation of her First Amendment rights.
     (Compl. ¶¶ 24–27 (Dkt. No. 1 at 9).) The Officers' Motion, however, requests qualified immunity solely

22   on Plaintiff's Fourth Amendment claims. (*See* Officers' Mot. 20–21 (Dkt. No. 22).) In their Reply (Dkt.
     No. 27), the Officers address the 1st Amendment arguments advanced in Plaintiff's Response. But the

23   Reply was significantly over the page limit mandated by Local Rule CR 7(e)(3), and therefore pages
     thirteen through nineteen were stricken by this Court's Minute Order (Dkt. No. 31). Because the

24   Officers' Motion did not request qualified immunity on Plaintiff's 1st Amendment claim (or even mention
     it) and because the issue has not been properly briefed, the Court declines to rule on whether the Officers

25   are entitled to qualified immunity on the 1st Amendment claim.

26   ORDER – 9

### 1.   Constitutional Violation

The initial inquiry in analyzing a qualified immunity defense is: "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. Plaintiff alleges that her stop and detention violated clearly established Fourth Amendment principles.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the police, and its protections extend to brief investigatory stops of persons or vehicles that fall short of a traditional arrest. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (*citing Terry*, 392 U.S. at 9). In *Terry*, the Supreme Court created a limited exception to the general rule that police detention requires probable cause, wherein "an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This "reasonable suspicion" standard is considerably less demanding than the preponderance of the evidence standard required for probable cause. *Id.* However, the Fourth Amendment still requires "a minimal level of objective justification for making the stop" and "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* (*citing Terry*, 392 U.S. at 27). A legitimate *Terry* stop therefore requires "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). This determination must be based upon "the totality of the circumstances." *Arvizu*, 534 U.S. at 273.

### a.   Investigative Stop

The threshold question here is whether D.C. Macklin had the requisite reasonable suspicion to initiate an investigatory stop. Defendants argue that the Officer's knowledge about concerns over terrorist activity at the substation, combined with Plaintiff's suspicious activities of taking pictures and avoiding contact with employees, strongly support reasonable suspicion. (Officers' Mot. 13–14 (Dkt. No. 22).) Plaintiff does not dispute that the BPA facility was designated as a potential terrorist target, or that

ORDER – 10

1   Snohomish police officers were informed of the sensitive nature of the substation. Plaintiff does dispute,

2   however, that she ran from or attempted to avoid contact with BPA personnel when she left. (1st Resp.

3   15 (Dkt. No. 24).) Regardless of whether Sheier *actually* ran or was aware of attempted contact by the

4   BPA, the evidence indicates that the BPA *reported* to the Officers that the suspect had avoided contact.

5   After investigating at the facility, Officer Gibson advised D.C. Macklin that the suspect "ran to her

6   vehicle, and quickly left" when a BPA employee attempted contact. (Macklin Memo 1 (Dkt. No. 20 at

7   37); Gibson Report 1 (Dkt. No. 20 at 19) ("When the female saw [the BPA employee] approach, she ran

8   to her vehicle and left . . . . I advised D.C. Macklin of the vehicle description . . . and the details.")

9   Consequently, D.C. Macklin had reason to believe that the suspect had avoided contact at the BPA

10  facility when he initiated the stop.

11      A person's attempt to avoid contact with authority in an area of heightened concern for criminal

12  activity may provide reasonable suspicion for an investigative detention. In *Illinois v. Wardlow*, 528 U.S.

13  119, 124 (2000), the U.S. Supreme Court held that a suspect's presence in an area of heavy narcotics

14  traveling and his unprovoked flight provided reasonable suspicion to conduct an investigatory stop. The

15  Court explained that an individual's presence in an area of expected criminal activity, standing alone, is

16  insufficient to establish reasonable suspicion. *Id.* Nevertheless, "officers are not required to ignore the

17  relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious

18  to warrant further investigation." *Id.* In addition, a suspect's "evasive behavior" is a "pertinent factor in

19  determining reasonable suspicion. *Id.* As in *Illinois*, the sensitive nature of the location of Plaintiff's

20  activities and her reported evasive behavior, support a finding of reasonable suspicion.

21      D.C. Macklin's knowledge that the Department of Homeland Security designated the BPA facility

22  as a potential terrorist target and was concerned about surveillance, (Macklin Memo 1 (Dkt. No. 20 at

23  37),) are relevant factors in his determination of reasonable suspicion. *See Arvizu*, 534 U.S. at 273

24  (explaining that the reasonable suspicion determination "allows officers to draw on their own experience

25  and specialized training to make inferences about the cumulative information available to them"). While

26  ORDER – 11

Sheier's photography may be innocuous when viewed in isolation, the totality of the circumstances provided context to establish reasonable suspicion of unlawful activity. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000) (explaining that "sometimes conduct that may be entirely innocuous when viewed in isolation may properly be considered in arriving at a determination that reasonable suspicion exists"). Given the sensitive nature of the BPA facility, Sheier's activities in taking photographs outside the security gate, then reportedly avoiding contact with personnel and quickly leaving, provided reasonable suspicion for D.C. Macklin to initiate an investigatory stop.

### b.      Handcuff, Frisk, and Detention in Police Car

The next question is whether the Officers' actions in removing Scheier from her vehicle, handcuffing her, frisking her, and placing her in the back of the police car, exceeded the permissible bounds of an investigatory stop. In answering this question for qualified immunity on summary judgment, the record must be read in the light most favorable to Plaintiff. *Saucier*, 533 U.S. at 201. The Officers assert that the roadside stop generated further suspicions that justified their actions and further investigation. (Officers' Mot. 8–10 (Dkt. No. 22).) Plaintiff argues that the Officers' suspicions did not justify the handcuffing, frisk, and detention, and that such intrusive methods were unreasonable given that she was cooperative and did not pose a threat to officer safety. (1st Resp. 18–19 (Dkt. No. 24).)

The determination of whether an investigatory stop has become an arrest requiring probable cause depends on the intrusiveness of the stop and the justification for the police methods used. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Courts compare "the aggressiveness of the police methods and how much the plaintiff's liberty was restricted" against "whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* As a result,

> [W]hile certain police actions constitute an arrest in certain circumstances, e.g., where the "suspects" are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists.

*Id.* In short, the court must evaluate "not only how intrusive the stop was, but also whether the methods

ORDER – 12

used were reasonable *given the specific circumstances.*" *Id.*

The use of handcuffs is an important factor to consider in determining whether an arrest has occurred because "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982). The reasonableness of handcuffing a suspect depends, in particular, on whether handcuffs are reasonably necessary "to allow the officer to pursue his investigation without fear of violence." *Id.* (*quoting Adams v. Williams*, 407 U.S. 143, 146 (1972)). In *Bautista*, the court held that the use of handcuffs was reasonably necessary, and did not convert the stop into an arrest, where one of the armed robber suspects "kept pacing back and forth and looking . . . as if he was thinking about running." *Id.* The handcuffs thus eliminated the possibility of an assault or escape. *Id.* at 1290; *see Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) (handcuffing reasonable because "officers had information that the robbery suspects had fired on witnesses and therefore had reason to believe the suspects were armed and dangerous"). On the other hand, handcuffing can escalate an investigative stop into an arrest were there is no evidence that the suspect is dangerous or poses a flight risk. *See United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (handcuffing an important factor in determining that an arrest had occurred because there was no evidence suspect was particularly dangerous).

Another important factor in the degree of intrusiveness is "whether the police physically restrict the suspect's liberty." *Washington*, 98 F.3d at 1189; *see United States v. Chamberlin*, 644 F.2d 1262, 1267 (9th Cir. 1981) (holding suspect in the back of a patrol car for twenty minutes and questioning him was equivalent to an arrest). Although there is "no per se rule that detention in a patrol car constitutes an arrest," such conduct "may exceed the boundaries of a lawful *Terry* stop in some circumstances." *Alexander*, 64 F.3d at 1320 (citations omitted). For example, in *United States v. Ricardo D.*, 912 F.2d 337, 341 (9th Cir. 1990), the court stated that "detention in a patrol car exceeds permissible *Terry* limits absent some reasonable justification." The court then concluded that the placement of the suspect in a patrol car where there was no evidence the suspect was dangerous was a "significant factor" in its

ORDER – 13

1    determination that an arrest occurred. *Id.*

2          Courts examine the reasonableness of these intrusive police methods in light of a number of

3    factors. Intrusive means of effecting a stop have been found justified where: (1) the suspect is

4    uncooperative or takes action at the scene that raises the threat of flight, (2) the police have information

5    the suspect is currently armed, (3) the stop closely follows a violent crime, and (4) the police have

6    information that a violent crime is imminent. *Washington*, 98 F.3d at 1189. In addition, courts consider

7    the ratio of officers to suspects in assessing the reasonableness of aggressive tactics. *Id.* at 1190; *see*

8    *United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (holding that it was reasonable shortly after

9    a bank robbery for a single officer to utilize intrusive methods when stopping two suspects).[7]

10          In this case, it is undisputed that the Officers removed Sheier from her car, handcuffed her, frisked

11   her, and then placed her in the back of a patrol car. These actions undoubtedly constitute intrusive police

12   methods for which the Fourth Amendment requires reasonable justification. *See, e.g.*, *Ricardo D.*, 912

13   F.2d at 341 ("detention in a patrol car exceeds permissible *Terry* limits absent some reasonable

14   justification"); *Bautista*, 684 F.2d at 1298 ("handcuffing . . . is not part of a typical *Terry* stop"). The

15   Officers highlight two main facts that heightened their suspicions during the stop and therefore justified

16   their intrusive techniques. (Officers' Mot. 8, 14–15 (Dkt. No. 15).) First, Scheier told the Officers that

17   she discovered the BPA substation when traveling from North Seattle to Everett. (*Id.* at 15.) This

18   apparently heightened suspicions because Snohomish is a detour when traveling between Seattle and

19   Everett. (*Id.*) Second, the Officers' noticed a map in the car with circles around sites such as Seatac

20   airport, the Seattle Center, and the Westin hotel. (*Id.*) This also concerned the Officers given that Scheier

21

22          [7]The Eighth Circuit examines similar factors in determining whether the amount of force used
     during an investigative stop constitutes an arrest: (1) the number of officers and police cars involved, (2)
23   the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the
     officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the
24   presence or lack of suspicious behavior or movement by the person under observation, and (6) whether
     there was an opportunity for the officer to have made the stop in less threatening circumstances. *United*
25   *States v. Thompson*, 906 F.2d 1292, 1296 (8th Cir. 1990).

26   ORDER – 14

1  was a Seattle resident and the map highlighted critical infrastructure/possible terrorist targets. (*Id.*)

2  Neither of these facts, however, indicate that Scheier was dangerous or posed a flight risk. While these

3  factors may have justified continuing the stop to permit the Officers to contact the FBI, they do not

4  provide a reasonable justification for the invasive police techniques employed here—removing Scheier

5  from her vehicle, handcuffing her, frisking her, and detaining her in the back of a patrol car.

6        Viewing the evidence in the light most favorable to Plaintiff, the Court finds that none of the

7  factors that have been found to justify the Officers' invasive police tactics were present here. First, the

8  evidence demonstrates that Sheier was cooperative during the stop. Upon contact, Sheier immediately

9  provided her license and registration. (Macklin Report 1 (Dkt. No. 20 at 34).) She also showed her

10  University of Washington employee card, thereby indicating that she was a professor, and provided her

11  camera to corroborate that she had taken seventeen pictures. (*See id.*) Scheier also promptly answered all

12  questions asked of her. (S*ee* Macklin Dep. 98:4–5 (Dkt. No. 26-3 at 11) ("Q: Did she seem cooperative

13  at this point? A: Yeah").) Macklin suggests that Scheier became uncooperative because "[h]er responses

14  to my questions didn't ring true . . . they didn't make sense." (Macklin Dep. II 18:2–6 (Dkt. No. 26-3 at

15  23).) But such behavior is not "uncooperative" merely because, in the officer's mind, "[t]he power lines

16  aren't poetic" and do not "rise to anything artistic." (*Id.* at 20:1–2.) Macklin also stated that Scheier

17  failed to comply with the other officers' directions. (*Id.* at 18:5–6.) However, no such failure is noted

18  either in his police report or in his memo to Chief Wiborg, both written on the date of the incident. In

19  fact, Officer Gibson's near contemporaneous report twice confirms that Scheier was "cooperative" during

20  the stop. (Gibson Report 2 (Dkt. No. 20 at 20) ("Shirley was cooperative but did keep claiming that there

21  were no signs stating that she was not allowed to photograph . . . .").) Thus, Scheier's cooperative

22  demeanor weighed against the need to utilize intrusive police methods. *See Del Vizo*, 918 F.2d at 825

23  (officers' use of handcuffs not justified because suspect fully cooperated with police orders).

24        Second, the record reveals nothing to indicate that Scheier would attempt to flee during the stop.

25  The Officers' contend they had concerns Scheier would flee because of earlier reports that she avoided

26  ORDER – 15

contact with BPA personnel. (Officers' Mot. 10 (Dkt. No. 22).) However, D.C. Macklin directly testified

that, during the stop, Scheier gave no indication that she might attempt to flee:

> Q: Did she pull over when you pulled behind her?
> A: Yes.
> Q: Did she make any movements that indicated she was trying to escape at that point?
> A: No.
> Q: At any time after you pulled her over, what made you think she would–what did she
>    do that indicated to you that she was trying to escape?
> A: Nothing.

(Macklin Dep. II 26:15–23 (Dkt. No. 26-3 at 25).) As discussed above, reports that Scheier had

apparently avoided contact at the BPA facility contributed to the Officers' reasonable suspicion to *initiate*

the stop. Nevertheless, once Scheier provided the Officers with all relevant documents, answered their

questions, and explained her conduct; there was no *reasonable* risk of flight absent the development of

other specific indicators during the stop. *See United States v. Holzman*, 871 F.2d 1496, 1502 (9th Cir.

1989) (manual restraints justified because suspect was "attempting to flee the area").

Third, there is no evidence that the Officers had information indicating Scheier was armed or

otherwise dangerous. *See Jacobs*, 715 F.2d at 1345–46 (officers' intrusive measures justified where

dispatch described the suspects as "possibly armed and under the influence of PCP"). Neither the police

reports nor the 911 dispatch indicate that Scheier could be dangerous. In deposition testimony, the

Officers offer only generalized concerns regarding a potential threat. (Gibson Dep. 34:20–22 (Dkt. No.

26-4 at 6) ("[A]s a police officer, anyone is capable of a physical threat against me"); Macklin Dep.

119:18–20 (Dkt. No. 26-3 at 18) ("Q: Did you have any reason to believe that she had weapons on her

person? A: Well, I–don't know. I didn't see any weapons on her at all, no. The suspicious circumstances

we were investigating gave me cause for concern").) The Officers also contend that the situation was

dangerous because they were investigating suspicious circumstances regarding "possible terrorist

activity," which is violent by its very nature. (Reply 8 (Dkt. No. 27).) By the Officers' logic, then, the

police would be justified in handcuffing, frisking, and detaining virtually anyone suspected of "suspicious

activity" near a critical infrastructure. The Fourth Amendment demands more.

ORDER – 16

Finally, the record is completely devoid of any evidence indicating that the stop followed a violent crime or that a violent crime was imminent. *See Alexander*, 64 F.3d at 1317 (physical restraints justified because robbery suspects had fired shots at a witness forty-five minutes earlier). Any lingering concerns about whether Scheier might be dangerous were dispelled when the Officers frisked her and found no weapons or contraband. (Macklin Dep. 122:20–23 (Dkt. No. 26-3 at 17).) The use of handcuffs and detention in the patrol car *after* Scheier was frisked could not be reasonably justified based on officer safety, especially given the presence of three officers (two male and one female) to control one female suspect. *See Washington*, 98 F.3d at 1190 (finding the presence of four officers in detaining two suspects weighed against the reasonableness of handcuffing and detaining the suspects in patrol cars).

Considering the totality of the above circumstances, the Officers' intrusive actions in removing Scheier from the car, frisking her, handcuffing her, and detaining her in a patrol car were not reasonably necessary to effectuate the investigative stop. Absent credible evidence that Sheier posed a threat to officer safety or a risk of flight beyond what any suspect might pose, the Officers lacked a reasonable justification for their aggressive tactics in completely restraining Scheier's personal liberty. *See Washington v. Schaffer*, No. C05-5372, 2006 U.S. Dist. LEXIS, at *21 (W.D. Wash. 2006) (noting that handcuffing requires evidence that the suspect "posed a threat to officer safety or risk of flight beyond what any suspect might pose by virtue of being unhappy about being detained and investigated"). The Officers' techniques were therefore unreasonable under the circumstances and escalated the investigative stop into an arrest for which they lacked probable cause.[8]

---

[8] Probable cause exists when, under the totality of the circumstances known to the arresting officer, "a prudent person would have concluded that [the suspect] had committed a crime." *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006). The Officers do not contend, nor could they, that probable cause existed to arrest Scheier for a federal terrorism crime. Rather, they summarily assert that "probable cause to arrest on criminal trespass second degree existed." (Officers' Reply 4 n.1 (Dkt. No. 27).) For the reasons discussed above, the Court finds no evidence that the Officers stopped Scheier because of an alleged trespass. Moreover, D.C. Macklin directly testified: "I don't have probable cause for trespass, criminal trespass arrest, no." (Macklin Dep. 77:13–14 (Dkt. No. 20 at 5).) Thus, the Officers did not possess probable cause to arrest Scheier for trespass.

ORDER – 17

1    The Fourth Amendment requires that the use of intrusive police tactics be justified by some

2    concomitant *reasonable* need to protect officer safety or preserve the status quo. An individual's

3    fundamental Fourth Amendment right to be free from "unreasonable searches and seizures" does not

4    dissipate merely because of generalized, unsubstantiated suspicions of terrorist activity. Because the

5    record discloses no evidence that Scheier was dangerous or posed a flight risk, the Officers' significant

6    intrusion on her personal liberty violated established Fourth Amendment principles. Accordingly, the

7    evidence establishes a violation of Plaintiff's Fourth Amendment rights.

8                    **2.      Clearly Established Law**

9        Once a constitutional violation is established on a favorable view of the plaintiff's submissions, the

10   second inquiry is whether the right was "clearly established." *Saucier*, 533 U.S. at 201. This is

11   determined by "whether it would be clear to a reasonable officer that his conduct was unlawful in the

12   situation he confronted." *Id.* at 202. Plaintiff need not cite to a case specifically on point establishing that

13   the Officers' action was unlawful. Rather, she need only establish that in light of preexisting law, the

14   unlawfulness of the Officers' conduct is apparent. *See Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987).

15   While the question of clearly established law is for the Court, it is the jury that is "best suited to determine

16   the reasonableness of an officer's conduct in light of the factual context in which it takes place." *Sloman*

17   *v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994).

18       The Fourth Amendment clearly requires that police have reasonable justification for handcuffing

19   and detaining a suspect in a patrol car during an investigatory stop. *Alexander*, 64 F.3d at 1321 ("[T]he

20   law clearly establish[s] that handcuffing a suspect and placing him in a patrol car during an investigatory

21   stop requires some reasonable justification."); *Ricardo D.*, 912 F.2d at 341 (explaining that "detention in

22   a patrol car exceeds permissible *Terry* limits absent some reasonable justification"). The law also clearly

23   establishes that an officer's use of intrusive techniques on a cooperative suspect, such as handcuffs and

24   detention in a patrol car, transforms an investigative stop into an arrest unless such action is reasonably

25   necessary for officer safety or to preserve the status quo. *See, e.g.*, *Washington*, 98 F.3d at 1190

26   ORDER – 18

1  (intrusive police action, including handcuffing and detention in patrol car, constituted an arrest because

2  the officers had no information that the suspects were armed or that a violent crime preceded the stop);

3  *Del Vizo*, 918 F.2d at 825 (handcuffing an important factor in determining an arrest had occurred because

4  there was no evidence suspect was particularly dangerous); *Chamberlin*, 644 F.2d at 1267 (holding

5  suspect in the back of a patrol car for twenty minutes and questioning him was equivalent to an arrest).

6  Therefore, it would be apparent to a reasonable officer that, absent *reasonable* justifications, the use of

7  intrusive police techniques on Scheier violated clearly established Fourth Amendment principles.

8       Under the circumstances presented here, there was no reasonable justification for the Officers to

9  handcuff Scheier, frisk her person, and then detain her in a patrol car. *See United States v. Sanders*, 994

10  F.2d 200, 206 (9th Cir. 1993) ("The relevant inquiry is always one of reasonableness under the

11  circumstances."). The Officers' primary justification for escalating their intrusion on Scheier's liberty was

12  based on their suspicions of "terrorist activity." (Officers' Mot. 8, 13–15 (Dkt. No. 22).) This suspicion

13  that Scheier might be involved in terrorist surveillance of the BPA was apparently heightened by her map

14  with critical infrastructures circled and her allegedly implausible story of how she first discovered the

15  facility. (*Id.*) However, in light of Scheier's cooperation and absent any evidence that she posed a threat

16  or was attempting to flee, these suspicions cannot justify the intrusive police techniques employed in this

17  case. The Officers' concern about Scheier's photography and quick departure from the BPA facility,

18  combined with the map and her supposed implausible story, could justify continuing the stop so they

19  could contact the FBI and verify her background. But the combination of these concerns did not justify

20  handcuffing Scheier, which "substantially aggravates the intrusiveness" of a stop, *Bautista*, 684 F.2d at

21  1298, and detaining her in the patrol car, which "exceeds permissible *Terry* limits absent some reasonable

22  justification." *Ricardo D.*, 912 F.2d at 341. The Court simply cannot find as a matter of law that the

23  Officers' intrusive methods were reasonable on these facts.

24       There is undoubtedly "no bright line rule for determining when an investigatory stop crosses the

25  line and becomes an arrest." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002).

26  ORDER – 19

1   Nevertheless, clearly established law provides that handcuffing a cooperative suspect and detaining her in

2   a patrol car, where not reasonably necessary for officer safety or to prevent flight, constitutes an arrest.

3   Because there is no credible evidence that Scheier was dangerous or posed a risk of flight, a reasonable

4   officer would have known that handcuffing, frisking, and detaining Sheier in the patrol car violated

5   established Fourth Amendment principles. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982) ("If

6   the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent

7   public official should know the law governing his conduct."). Accordingly, the Officers are not entitled to

8   qualified immunity and their motion for summary judgment is hereby DENIED.

9       **E.      The City's Summary Judgment Motion**

10      Defendants request summary judgment dismissal of Plaintiff's constitutional claims against the

11  City of Snohomish, arguing that Plaintiff has failed to establish a basis for municipal liability. (City's Mot.

12  7–13 (Dkt. No. 32).) Defendants also argue that Plaintiff's state law claims for false arrest, negligence,

13  and invasion of privacy fail as a matter of law and should be dismissed. (*Id.* at 15–18.)

14      **1.      Constitutional Claims**

15      A plaintiff can establish municipal liability under 42 U.S.C. § 1983 in one of three ways. *Gillette*

16  *v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). "First, the plaintiff may prove that a city employee

17  committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding

18  practice or custom which constitutes the standard operating procedure of the local governmental entity."

19  *Id.* (internal quotations and citation omitted). "Second, the plaintiff may establish that the individual who

20  committed the constitutional tort was an official with 'final policy-making authority' and that the

21  challenged action itself thus constituted an act of official governmental policy." *Id.* (*citing Pembaur v.*

22  *City of Cincinnati*, 475 U.S. 469, 480-81 (1986). "Third, the plaintiff may prove that an official with final

23  policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."

24  *Id.* at 1346–47 (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Here, Plaintiff asserts

25  municipal liability based upon two of the above theories: (1) the City's ratification of the Officers'

26  ORDER – 20

1    unconstitutional conduct, and (2) the existence of municipal policies that caused a constitutional harm.

2    (2nd Resp. 1 (Dkt. No. 36).)

3                    **a.    Ratification of Unconstitutional Conduct**

4            A single decision by a municipal official that ratifies unconstitutional conduct may be sufficient to

5    trigger section 1983 liability if that official has "final policymaking authority." *Pembaur*, 475 U.S. at

6    481–83; *Gillette*, 979 F.2d at 1347.[9] To establish ratification, however, there must be evidence of a

7    "conscious, affirmative choice" by the policymaker to approve a subordinate's decision, and the basis for

8    it. *Gillette*, 979 F.2d at 1347–48 (*citing Praprotnik* 485 U.S. at 127). "Ordinarily, ratification is a

9    question for the jury." *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).

10           The Ninth Circuit distinguishes between affirmative or deliberate conduct by a policymaker, which

11   constitutes ratification, and mere acquiescence, which is insufficient to establish municipal liability by

12   ratification. *See Gillette*, 979 F.2d at 1348. In *Gillette,* the court found that a city manager's

13   "acquiescence in [the plaintiff's] termination" merely amounted to "inaction" that failed to establish

14   ratification under *Pembaur* and *Praprotnik*. *Id.* The fact that the city manager "did not overrule" or "did

15   not object" to a subordinate's decision, was insufficient to establish that the city made "a deliberate

16   decision to endorse" the alleged unconstitutional action. *Id.* In contrast, in *Fuller v. City of Oakland*, 47

17   F.3d 1522, 1534 (9th Cir. 1995), the court found section 1983 municipal liability where a police chief

18   ratified an unconstitutional investigation by expressly "approv[ing] both of the propriety of the

19   investigation and the reports conclusions."*See also Christie*, 176 F.3d at 1240 (finding municipal liability

20   via ratification where prosecutor "affirmatively approved" of alleged constitutional violations).

21           Here, there is little doubt that the City Manager Bauman's three-page letter finding that the

22

23   _____

24           [9]Contrary to Defendants' assertion, Plaintiff need not establish an existing unconstitutional
     municipal policy to proceed against the City on the theory of ratification. *See, e.g., Christie v. Iopa*, 176
     F.3d 1231, 1238 (9th Cir. 1999) ("A municipality also can be liable for an *isolated constitutional*

25   *violation* if the final policymaker 'ratified' a subordinate's actions.") (emphasis added).

26   ORDER – 21

1   Officers' actions were "clearly justified," (City's Letter 3 (Dkt. No. 26-5 at 3),) constituted "affirmative

2   or deliberate conduct." Bauman wrote the letter in direct response to Senator Cantwell's inquiry

3   regarding the complaint that Scheier was "unreasonably detained." (Cantwell Letter 2 (Dkt. No. 37-4 at

4   2).) Thus, Bauman was aware of potential constitutional violations and was acting as the City's official

5    responsible for investigating the incident. *See Christie*, 176 F.3d at 1239 (ratification requires

6   "knowledge of the alleged constitutional violation"). After recounting the City's perspective of the

7   incident, Bauman specifically concluded that "it is our belief that the suspicious facts as we have

8   articulated them *clearly justified* the brief detention and actions taken by our officers when considered in

9   context." (City's Letter 3 (Dkt. No. 26-5 at 3) (emphasis added).) Unlike in *Gillette*, the city manager

10   here did not merely acquiesce or fail to object to unconstitutional conduct. Rather, City Manager Bauman

11   "made a deliberate choice to endorse the [Officers' conduct] and the basis for it." *Gillette*, 979 F.2d at

12   1348. As in *Fuller*, Bauman explicitly "approved . . . of the propriety" of the alleged unconstitutional

13   conduct. 47 F.3d at 1534. Consequently, City Manager Bauman ratified the alleged unconstitutional

14   conduct when, after reviewing the incident, he expressly approved of and officially endorsed the Officers'

15   actions as "clearly justified."

16        Municipal liability attaches only where the official is "responsible for establishing final policy with

17   respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Whether an official has final

18   policymaking authority is a matter of state law. *Id.* The Snohomish Municipal Code provides: "The City

19   Manager will be responsible for the line management of *all* departments, including *accountability* for

20   their performance." Snohomish Mun. Code § 2.38.030 (emphasis added). In addition, the Washington

21   Revised Code sets forth the City Manager's specific "powers and duties," which include: "[t]o appoint

22   and remove at any time all department heads, officers, and employees of the city or town," and "[t]o see

23   that all laws and ordinances are faithfully executed." WASH. REV. CODE § 35.18.060(2) & (4). Thus, City

24   Manager Bauman oversees line management of the City Policy Department, is responsible for

25   "accountability of their performance," and has the power to hire and fire officers. The Court finds that

26   ORDER – 22

1   such power and responsibility constitutes "final policymaking authority" over the propriety of officer

2   conduct. Moreover, Bauman's letter explicitly states that the Officers' conduct in handcuffing and

3   frisking Scheier was "within *our policy* and consistent with standard law enforcement standard operating

4   procedure," (City's Letter 2 (Dkt. No. 26-5 at 2) (emphasis added),) thereby indicating his involvement

5   with and approval of the polices and procedures at issue. Because City Manager Bauman had final

6   policymaking authority and ratified the Officers' conduct, Plaintiff has sufficiently established ratification

7   to avoid summary judgment on municipal liability for her constitutional claims.[10]

8              **2.     State Law Claims**

9         Plaintiff also alleges state law claims for false arrest, negligence, and invasion of privacy against

10   the Officers, and asserts the City is responsible under the doctrine of *respondeat superior* (Compl. ¶¶

11   17–19 (Dkt. No. 1 at 8).) Defendants contend that these state law claims fail as a matter of law and

12   should be dismissed on summary judgment. (City's Mot. 19 (Dkt. No. 32).)[11]

13              **a.     False Arrest**

14        Under Washington law, false arrest occurs when a law enforcement officer unlawfully restrains or

15   imprisons another without legal authority. *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash. 1985).

16   The legality of Scheier's detention under state law turns on whether she was arrested and whether the

17   Officers had probable cause. *See id.* The existence of a custodial arrest under state law depends on

18   whether a reasonable person would believe herself free to leave under similar circumstances. *State v.*

19   *Rivard*, 929 P.2d 413, 419 (Wash. 1997). Typical signs of a custodial arrest include handcuffing, being

20

21        [10]Because the record provides sufficient evidence for Plaintiff to proceed on her theory of

22   municipal liability by ratification, the Court does not address Plaintiff's alternative argument that the
     City's unconstitutional policies provides another basis for municipal liability.

23

24        [11]The motion to dismiss the state law claims was filed by the City. However, because the City's
     liability on the state law claims under *respondeat superior* is derivative of the Officers' liability, the

25   Court's determination of the validity of each state law claim against the City is dispositive of the validity
     of that claim against the Officers as well.

26   ORDER – 23

1   asked not to leave, and placement in a police vehicle. *See id.* All of these indicators of a custodial arrest

2   are present here. The Officers handcuffed Scheier, frisked her, and detained her in a patrol car. In

3   addition, D.C. Macklin directly testified that "[Scheier] wasn't free to leave." (Macklin Dep. 113:19 (Dkt.

4   No. 26-3 at 14).) Because the record provides ample evidence to find that a reasonable person would not

5   believe herself free to leave under the circumstances, Scheier has sufficiently established that she was

6   arrested under state law.

7          Defendants primarily contend that no arrest occurred because the "public interest in investigating

8   possible terrorist activities at the BPA facility far outweighed Plaintiff's twenty-six minute detention in

9   handcuffs." (City's Reply 10 (Dkt. No. 40).) The Court disagrees. The relevant inquiry is whether the

10  *degree* of invasion on Scheier's personal liberty was reasonable in light of the public interest to be

11  advanced. *State v. Samsel*, 694 P.2d 670, 674 (Wash. Ct. App. 1985). As in the Fourth Amendment

12  context, a legitimate public interest in investigating the reported suspicious circumstances at the BPA

13  facility may have justified the initial stop, which was a relatively minor intrusion on Sheier's liberty.

14  However, the Officers possessed no *reasonable* basis for subsequently escalating the detention by

15  completely restraining Scheier's personal liberty. *See id.* ("The ultimate test for either an arrest or

16  investigative stop is reasonableness . . . ."). Scheier promptly provided her license, registration, and

17  employee identification indicating she was a University of Washington art professor. She also provided a

18  rational explanation for her activities—she was taking pictures of the facility to incorporate into her

19  artwork. Absent the development of specific information during the stop, such as evidence that Scheier

20  was dangerous or posed a flight risk, the degree of the Officers' invasion on Scheier's liberty was not

21  justified by their generalized suspicions of terrorist surveillance. The Court cannot find as a matter of law

22  that the significant intrusion on Sheier's personal liberty was reasonable under these circumstances.

23         The existence of probable cause is a complete defense to a false arrest claim. *McBride v. Walla*

24  *Walla County*, 975 P.2d 1029, 1032 (Wash. Ct. App. 1999). "The rule is that unless the evidence

25  conclusively establishes the lawfulness of the arrest, it is a question of fact for the jury to determine

26  ORDER – 24

whether an arresting officer had probable cause." *Daniel v. State*, 671 P.2d 802, 804 (Wash. Ct. App. 1983). Defendants summarily assert, in a footnote, that the Officers possessed probable cause to arrest Scheier for second degree trespass. (City's Mot. 17 n.2 (Dkt. No. 32).) This argument is contrary to all the reports created shortly after the incident, none of which mention anything about trespass, and contradicts D.C. Macklin's direct testimony. (Macklin Dep. 77:13–14 (Dkt. No. 20 at 5) ("No. I don't have probable cause for trespass, criminal trespass arrest, no").) Accordingly, summary judgment dismissal of Plaintiff's false arrest claim is inappropriate because she has sufficiently established a genuine issue for trial on the reasonableness of the Officers' restraint of her personal liberty.[12]

### b.    Negligence

Plaintiff asserts that the Officers are liable in negligence for breaching the general standard of care in detaining and searching her while performing their official duties. (2nd Resp. 12 (Dkt. No. 36).) Defendants argue that Washington does not recognize a general negligence claim against police officers and thus Plaintiff's negligent investigation claim is not actionable. (City's Reply 11 (Dkt. No. 40).)

To establish actionable negligence, a plaintiff must demonstrate the existence of a duty owed, breach of the duty, and a resulting injury caused by the breach. *Keller v. City of Spokane*, 44 P.3d 845, 848 (Wash. 2002). Washington courts have thus far declined to recognize a cause of action based on an official's negligent investigation or interrogation of criminal suspects. *See Denver v. Fowler*, 816 P.2d 1237, 1238 (Wash. Ct. App. 1991) (refusing to recognize a cause of action for negligent investigation and affirming dismissal for failure to state a claim); *Keates v. City of Vancouver*, 869 P.2d 88, 94 (Wash.

---

[12]The City contends that a state qualified immunity defense available to the Officers on the false arrest claim extends to it through *respondeat superior*. (City's Mot. 17 (Dkt. No. 32).) State qualified immunity on a false arrest claim is limited to where: (1) the police officer reasonably believed the suspect committed a felony; (2) the arresting officer had reasonable cause to believe a misdemeanor was being committed in his presence and acted in good faith on that belief; or (3) the statute relied upon for the arrest was subsequently declared unconstitutional. *Staats v. Brown*, 991 P.2d 615, 626–27 (Wash. 2000). None of these scenarios applies here. The City's attempt to apply the third scenario fails because the Officers actions were not "predicated on a law subsequently determined unconstitutional." *See id.* at 627. Thus, the City is not entitled to qualified immunity on Plaintiff's false arrest claim.

ORDER – 25

Ct. App. 1994) (holding that police officers owe no duty to avoid inadvertent infliction of emotional distress during criminal investigations). Therefore, Plaintiff's negligence claim, based on the Officers' alleged violation of a general standard of care in investigating her, is not recognized under state law.

The two cases Plaintiff cites as supporting her general negligence claim against the Officers do not provide authority to the contrary. In *Bailey v. Forks*, 737 P.2d 1257, 1258 (Wash. 1987), the plaintiff alleged that her injuries in a car accident resulted from an officer's negligence in failing to prevent a man known to be heavily intoxicated from driving a truck. The court found that the negligence claim was actionable because the officer knew of a statutory violation and failed to take corrective action despite a statutory duty to do so. *Id.* at 1260. In *Mason v. Bitton*, 534 P.2d 1360, 1361 (Wash. 1975), the plaintiff's estate alleged that the officers were negligent in conducting a high speed chase that resulted in the plaintiff's death. The court found that the negligence claim could proceed because issues of material fact remained as to whether the officers violated a specific statute covering the duty owed by officers to the public when operating emergency vehicles. *Id.* at 1364. Both of these cases involved negligence claims where the officers owed a specific duty imposed by statute. Neither case created nor recognized a general negligence claim against law enforcement absent the imposition of a statutory duty. Therefore, summary judgment dismissal of Plaintiff's negligence claim is appropriate because she has failed to establish that her claim is recognized under state law.

### c.      Invasion of Privacy

Plaintiff asserts a claim for invasion of privacy by intrusion. (2nd Resp. 12–13 (Dkt. No. 36).) "Invasion of privacy by intrusion consists of a deliberate intrusion, physical or otherwise, into a person's solitude, seclusion, or private affairs." *Fisher v. Dep't of Health*, 106 P.3d 835, 879 (Wash. Ct. App. 2005). "The intruder must have acted *deliberately* to achieve the result, with the certain belief that the result would happen." *Id.* (emphasis added). "Intent is thus an essential element." *Id.* Plaintiff must therefore establish that the Officers "deliberately embarked on a course of conduct guaranteed to result in

ORDER – 26

an unlawful" intrusion her private affairs or effects. *See id.*[13] Plaintiff has made no such showing.

Plaintiff fails to identify an aspect of her *personal* affairs upon which the Officers' deliberately intruded. *See Mark v. King Broadcasting Co.*, 618 P.2d 512, 519 (Wash. 1980) ("The invasion or intrusion must be of something which the general public would be free to view."). Sheier's car was searched, but she expressly gave the Officers permission to do so. (Scheier Dep. 68:16–18 (Dkt. No. 26-2 at 10).) The Officers did not confiscate her camera film or any other personal belongings. Nor did they otherwise intrude into any of her personal effects. Because Plaintiff has not met her burden of establishing an intentional intrusion into her private affairs, her invasion of privacy claim fails as a matter of law.

## III.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Officers' Motion for Summary Judgment. The Court DENIES Defendant City of Snohomish summary judgment on Plaintiff's constitutional and false arrest claims, but GRANTS the City summary judgment on Plaintiff's negligence and invasion of privacy claims. Accordingly, Plaintiff's claims for negligence and invasion of privacy are hereby dismissed.


SO ORDERED this 4th day of November, 2008.



John C. Coughenour

UNITED STATES DISTRICT JUDGE

---

[13]Intent need not be proven where the intruder is the government *and* the plaintiff alleges a violation of the Washington State Constitution, article I, section 7. *See id*. Plaintiff has made no such allegation here, and instead alleges an intentional personal tort. Thus, she must prove the intrusion was deliberate.

ORDER – 27